MIED ProSe 7 (Rev 5/16) Complaint for Employment Discrimination

55

Pd. Receipt #15000 5279

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

Mona Matthews

Case: 2:23-cv-11141
Assigned To : Berg, Terrence G.
Referral Judge: Patti, Anthony P.
Assign. Date : 5/15/2023
Description: CMP MATTHEWS V.
DETROIT DISTRICT SPORTSERVICE, INC (NA)

*(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)*

*(to be filled in by the Clerk's Office)*

Jury Trial:   ☑ Yes   ☐ No
*(check one)*

v. Detroit
~~Detriot~~ District Sportservice, Inc
MM

*(Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)*

## Complaint for Employment Discrimination

MIED ProSe 7 (Rev 5/16)  Complaint for Employment Discrimination

## I.    The Parties to This Complaint

### A.    The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

| | |
|---|---|
| Name | Mona Matthews |
| Street Address | 948 Temple Street |
| City and County | Detroit, Wayne |
| State and Zip Code | Michigan, 48201 |
| Telephone Number | 313 265 5156 |
| E-mail Address | monapeach@outlook.com |

### B.    The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation.  For an individual defendant, include the person's job or title (if known).  Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | Detroit District Sportservice, Inc |
| Job or Title (if known) | |
| Street Address | 186 N. Main Street  2nd Floor |
| City and County | Plymouth, Wayne |
| State and Zip Code | Michigan 48170 |
| Telephone Number | Unlisted |
| E-mail Address (if known) | |

Defendant No. 2

| | |
|---|---|
| Name | |
| Job or Title (if known) | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address (if known) | |

Defendant No. 3

|                          |     |
|--------------------------|-----|
| Name                     |     |
| Job or Title (if known)  |     |
| Street Address           |     |
| City and County          |     |
| State and Zip Code       |     |
| Telephone Number         |     |
| E-mail Address (if known)|     |

Defendant No. 4

|                          |     |
|--------------------------|-----|
| Name                     |     |
| Job or Title (if known)  |     |
| Street Address           |     |
| City and County          |     |
| State and Zip Code       |     |
| Telephone Number         |     |
| E-mail Address (if known)|     |

## C.    Place of Employment

The address at which I sought employment or was employed by the defendant(s) is:

|                    |                       |
|--------------------|-----------------------|
| Name               | Little Caesar's Arena |
| Street Address     | 2645 Woodward Ave     |
| City and County    | Detroit, Wayne        |
| State and Zip Code | Michigan 48201        |
| Telephone Number   | 313 471 7000          |

MIED ProSe 7 (Rev 5/16)  Complaint for Employment Discrimination

## II.   **Basis for Jurisdiction**

This action is brought for discrimination in employment pursuant to *(check all that apply)*:

☑   Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (race, color, gender, religion, national origin).

*(Note:  In order to bring suit in federal district court under Title VII, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☑   Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621 to 634.

*(Note:  In order to bring suit in federal district court under the Age Discrimination in Employment Act, you must first file a charge with the Equal Employment Opportunity Commission.)*

☐   Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 to 12117.

*(Note:  In order to bring suit in federal district court under the Americans with Disabilities Act, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☑   Other federal law *(specify the federal law)*:
Equal Pay

☐   Relevant state law *(specify, if known)*:

☐   Relevant city or county law *(specify, if known)*:

### III. Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

A.  The discriminatory conduct of which I complain in this action includes *(check all that apply)*:

- ☐ Failure to hire me.
- ☐ Termination of my employment.
- ☑ Failure to promote me.
- ☐ Failure to accommodate my disability.
- ☐ Unequal terms and conditions of my employment.
- ☑ Retaliation.
- ☑ Other acts *(specify)*:

Race

Sex

Age

*(Note: Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court under the federal employment discrimination statutes.)*

B.  It is my best recollection that the alleged discriminatory acts occurred on date(s) For the charge 10/1/2021-04/30/2022. Discrimination started when the Arena opened

C.  I believe that defendant(s) *(check one)*:

- ☐ is/are still committing these acts against me.
- ☑ is/are not still committing these acts against me.

D.  Defendant(s) discriminated against me based on my *(check all that apply and explain)*:

- ☑ race  African American
- ☐ color
- ☑ gender/sex  Female
- ☐ religion
- ☐ national origin
- ☐ age. My year of birth is  1964 . *(Give your year of birth only if you are asserting a claim of age discrimination.)*
- ☐ disability or perceived disability *(specify disability)*

5

1A. Sexual harassment. I was subject to daily inapproiate behavior, talk, gestures and unwanted touching. Detroit District Sportservice, Inc was aware as they witnessed this behavior at Little Caesar's arena since it's open in 2017.

B. My white male coworker who ranked one number below me got to work higher paying events. And I skipped over as well a double shift. Detroit District Sportservice, Inc was aware as they made the schedules since the arena opened.

2. Retaliation. I was subject to retaliation when I complained of sexual harassment. Detroit District Sportservice, Inc did not address the problem and allowed me and the coworker to work alongside each other for approximately one month or more and until I alerted them, I would be taking the next step. I was taken off premium shifts. Subject to more of a hostile environment after my complaint with management as well as coworkers. Detroit District Sportservice, Inc is responsible as they made the schedules and discussed the situation with other staff and departments. Retaliation for this claim began in October of 2021 when I declined a job for $14 an hour as well as my Sexual harassment Claim in late January, early February of sexual harassment.

3. Race. I was denied training for different backstage, green rooms, TOP VIP assignments. New hire all Caucasian were trained for these areas. I asked for training but was not allowed. Detroit District Sport service is responsible as they made the schedules for the shifts and did the training from the beginning of the arena.

4. Age. We had an influx of new hires who were call younger under 40 Caucasian workers with the exception on one man. These younger employees were allowed to work the shifts I was complaining about. Detroit District Sportservice was responsible as they did the hiring and and scheduling. This occurred late 2021-2022.

E.    The facts of my case are as follows.  Attach additional pages if needed.

On January 29, 2022 Richard Shanks grabbed my hand to hold it, I jerked away. Assistant Manager and Manager where present and saw and heard the incident. No response form the manager, the assistant states, Ms. Mona is fiesty today. We were standing at her desk in front of Manager's office signing in and sign a protocol sheet. The assistant mangager had Covid 19 but I did not find out until a few days later. Richard and I proceeded to the East Gondola for our Red Wing shift. After setting up everything another coworker stopped by the pantry where we were. Then supervisor stopped by as well. Richard grabbed the broom and started sweeping the floor which he had never done since working at the arena. I then said Richard keep that same energy tomorrow when we work the Pistons Family Lounge tomorrow. Richard then grabbed his penis with the(suck my penis motion) I was horrified. I said Richard we have had this conversation before and I told you it would be conquences if you did it again. He states, what I'm looking for my keys. The other coworker states, Richard you need to find somewhere to keep your keys. The supervisor did not say one word which is not unusual as this is the culture of the catering department. I was starting not to feel well during the shift like I was coming down with something as well as upset because of what Richard had done On January 30, 2022 we worked the Piston family lounge together, which that year because of Covid 19 no one was allowed to enter the lounge other than employees and security. The was not a full buffet as usual and we were operating in a doorway outside of the lounge along with the Piston staff. We had a cart with grab and go food, and a table of snacks. We stood no more than 2 feet from each other in the make shift area. At the beginning of the shift the assistant manager comes in to alert us she was leaving going home as she had just got there. During this shift Richard was saying gross and inapproriate things. This behavior was witness by Pistons staff as well as security. At one point during the shift I had my hand on the cart and Richard placed his hand on top of mine. I jerked it away, I later placed my hand on the cart and he placed his hand on mine a second and third time and I jerked away each time. By now I am so upset I walk away from Richard was talking off the wall making a scene so I walked away from the cart, Richard followed me and when I tried to re-enter the area Richard blocked the doorway and I had to walk around the other entry. When I returned Richard blurts you ought to be elated to see me tomorrow as we were scheduled to work another Red Wings game. The security officer replied, you should be elated to see me everyday as she thought Richard was speaking to her. Richard then states, no I am talking to her, referring to me. The officer says, Mona are you going to let him talk to you like that, its three against 1 meaning it was her, the Pistons rep and myself (ladies) against one man. I told her I have to ignore Richard because he goes really low and is inappropriate.

*(Note:  As additional support for the facts of your claim, you may attach to this complaint a copy of your charge filed with the Equal Employment Opportunity Commission, or the charge filed with the relevant state or city human rights division.)*

Richard said we were going to hold hands and sit next to each other tomorrow in the Gondola. Richard also stated that I should bring him a bucket of chicken and a pack of cigarettes tomorrow. The security officer said you are really looking for a heart attack. We were in this very small space with the client as well as security and I was trying to show professionalism and ignore Richard to diffuse his behavior. I thought to myself after this shift I am going to tell the manager what happened tonight as well as the entire weekend. A fellow coworker working in a different department saw me as I was entering the office and said WOW you don't look good at all. I stated I don't feel well at all. Mark's office was full as the time clock was broken and we had to manually sign out, so I decided to tell him everything the next day. On January 31, 2022 I was scheduled to work but I called off due to a migraine. I was scheduled for February 1, 2022, I received a call in the morning from the assistant manager who was still out ill asking if I could work the Labatt Blue Club because they were going to be short today. I first told her I couldn't because I was working in the family lounge, she states. oh yes that right, I'm out of it today. Since she was calling about the schedule I told her I wasn't feeling well, she then told me to call Mark and let him know as she was not in today. I replied ok. I Text Mark and tell him I still was under the weather. In my text I explained I started to feel bad in the gondola on Saturday, I worked Sunday, and it was worsening. I also text him that working with Richard is becoming a strain and is affecting me in multiple ways. The Manager stated ok he would get the shift covered but we need to discuss the situation with Richard. I said ok. I then called the Manager on the phone and told him exactly everything that happened the weekend and reminding him of Richards behavior that we all were aware of, but this crossed the line with me. He asked me did I want him to take care of it I said yes. He asked that I send him a statement over and I said ok, He then text me and asked if I was going to the doctor(he knew I had been exposed covid but I did not know at the time) I asked him If I needed to go there was no reply I called him back several times no answer and then I text for a courtesy call. I can not remember if he called me back or not. As I was preparing to write the statement, I reflected on all the lies, deception and distrust and backstabbing that went on in the department. I told Manager that I had questions about the statement as he would not answer my calls, so I had to text. I decided against it because I did not trust him or any of the management staff. I knew it was sufficient that I made him aware of the situation. I asked if we could have a meeting with the four of us by zoom or conference call. He replied yes but would be taking notes and would escalate it if necessary. We never had the meeting. On February 3 the next week's schedule came out and I was not working both days in the family lounge which I was told by manager that was my room to work, upset about this I texted him and asked why. I was scheduled to work Thursday of that week. I showed up for my shift and was sent home by a supervisor who stated I did not look well, and I need to leave and have a covid test because the assistant manager has covid and it is running rampant in the office. It was a bad snowstorm so when I reached the testing site it was closed. I went in the morning and tested positive and sent results to supervisor and manager as assistant manager was still out. I was scheduled to work February 9 and I went to get a covid test as well had to be tested for the Elton John show. I still was upset that no one told me of our exposures to Covid as well as the situation with Richard had not been addressed. I didn't mind working this shift because Richard was not scheduled to work. When I report for my shift, my jaw is somewhat swollen, and I see Richard and wonder what he was doing there as he was not on the schedule. Come to find out he is working the shift with me after my complaints and allegations, this made for an uncomfortable shift. During this shift I told Mark that my check was short, he told me to stop by the office after the shift and we could look over it. After my shift I went in the office Mark viciously attacked me telling me he didn't have to schedule me in the Family Lounge when I only was asking about my check being short. He never asked

about what happened with Richard. He was talking to me in a demeaning manner, the door was open discussing my pay people were in the office and could hear everything that was said about my pay and they way he spoke to me, he kept telling me if I did not like it that I could file a grievance. Before I could even finish my sentence, he interrupted me on two other occasions and said file a grievance. I gathered my things and told him it was retaliation, and I left the office. On my way home I thought about how I felt in that moment in his office with him reprimanding me and I was the only person of color in the office I felt very uncomfortable and not safe at all as He was putting on a show. I then texted him not to call me into his office again unless there was a third-party present, he replied ok.

After my sexual harassment claims Richard and I was still scheduled to together which was uncomfortable as well as our staff and the entire arena knew of my claims, but nothing was being done about it only gossip and speculation which lead to an even more hostile environment. I did not think it was going to come to this, I felt the situation was going to be handled swiftly. It turns out the situation was not handled at all.

I worked at the Dui Lipa press dining event which consisted of clearning and clearing tables while other new employees worked behind the serving line and new and outside the department employess worked backstage and dressing rooms. Something that I never had the chance to work on. On the shift I was yelled at by two supervisors who later apologized but said they were acting on behalf of the assistant manager's wishes. I was yelled at the catering manager and supervision again on this day as well. While I was in the back having a break the door slammed open and said all right back on the floor as I had just sat down. I was being harassed and I was going to report it.

I made human resources aware of the sexual harassment allegations maybe mid to late February and when nothing got done, I sent an email on March 4 with the subject harassment, sexual harassment, retaliation, favoritism, theft etc. letting them know I was taking the next steps. I sent this to management, human resources and corporate it wasn't until then I got a response. I also filed a grievance with my union. I was on bereavement leave the prior Friday, Monday March 7 and 8. There was a meeting to held with the company, myself and the union on March 9. The General Manager stated he was unaware of what was happening, I told him about the stolen merchandise that had been stolen his assistant manager and supervisor, but he was going to take care of it. In this meeting I asked that he run the surveillance tape so he could see Richard touching my hand and his foolery and when the merchandise was stolen but he did not. So, an investigation was launched, and Richard was suspended. However, per Richard and other coworkers he was called in to work during his suspension because they were hosting the NCAA tournament March 17 and 19 and small events leading up to it and he was called in to work.

March 21, 2022, I was scheduled to work the family lounge alone I had not been in therein over 1 month. When I arrived the boxes of chips for me to use that were placed in the room were all expired, very old. I was upset as it seems this was done on purpose. As tension was high in the department I went to the general manager and asked him to come and see what had happened. Luckily for me I looked at the dates, The general manager then stated to me his managers would never do that on purpose. He called them and they came in with an attitude and asked where the expired items were. I pointed the manager said you seem like you are agitated I stated to him you seem like you are agitated he looked as if he was going to punch me the assistant manager grabbed his arm and yelled come were going to see Asia. I said No, I know where she is I will go there he told me NO, we are going together. I

told him I was not going anywhere with them. He then yelled and told me to go see Asia so I did. Asia, general manager and I met and decided I could take a two week leave until the start of the Tigers and not finish the games out at the arena. I did but there was a miss misunderstanding I just wanted to take two weeks off until Piston and Wings ended not the entire summer, so we had to straighten that out. My name was taken off the schedule for the two weeks.

I sent the staff an email letting them know I was still with the catering department because my name was taken off the schedule.

I was called in for a write up because I called off with a fever less than 4 hours for my shift. I was told not to report if I had a fever and so, they tried to add all dates together as a cumulative write up. NO progressive counseling, which the dates stated were incorrect, which later was changed through a grievance. Manager in this meeting when I asked why he not did anything about sexual harassment claims he stated I never told him anything in the presence of two people, the assistant manager and a union steward. I then said You are lying you know full well I told you everything in details he was stunned I spoke up then replied well you didn't put it in writing. I stated to him that telling you was enough, and you did nothing and now it is all over the arena.

There was severe hostility for me in the arena. People ridiculed me because of my age and looks and were wondering why Richard would want to sexually harass me. Not knowing they are a different types of sexual harassment which was going on every day. I tried but couldn't stop the language and jokes and remarks, but I could control unwanted touching.

My coworker and I had a meeting with the union, human resources and the company regarding the way the collective bargaining agreement was not being followed. As result that year alone we lost 15, 000 because we were not scheduled by seniority. They were going to fix that issue but continued. Then the company and union played this game stating the wording needed to be different in the aggreement which all department in the arena that are union schedule by seniority and can pick shifts, we were the only department that couldn't. So, they sent us on a wild goose chase trying to get language changed for the next contract which was unnecessary as it was already stated in the CBA to schedule by seniority with the intent to hire in as full time. Meaning maxing out the scheduled, we then took a vote early on maybe late 2017 or early 18 to see if we could settle then for 5 days scheduling from top to bottom and the majority won but still never happened.

I this was a seasonal part time position and the goal was to make as much money as possible during the season,

Since my allegations of sexual harassment, I have been treated much differently. I've missed out on shifts, taken of VIP parties, taken out of the boardroom, rotated in the family lounge, missed out on tips, never work backstage or green rooms did while new white, younger employees did. I was diminished to mediocre assignment never elevated to higher standard clients and situations or even trained for. Secret shifts were given to others and told not to say anything, which caused more hostility between workers and management. This was a form of retaliation. They got white coworkers below me mostly men to serve the Ilitch Family

So far as equal pay my coworker who was number three and I was number two always worked talent rooms, green rooms and double shifts that I did not work as many doubles as he. These rooms got

tipped out big. Like I said I never worked these areas and most times they tried to hide it on the schedule.

I do believe had I been a different race these claims would have been taken seriously.

So, knowing I can't report anything anymore I started taking notes on things I heard and asked for a meeting with management and human resources in late July and shared what I had, and this was corroborated by another, Richard was terminated. I really had a target on my back at this time.

Richard leaving moved us all up the seniority list however they did not schedule me events like the scheduled Richard.  The company   knew how much each event would bring in and they would schedule who they wanted to work to receive the most benefits.

I was number one in seniority and still missed VIP shifts, never backstage and Never the Ilitch Family.

Or the private annual dinners on the Ice. I never got to work at the alumni club when former players would be there.

The company typically uses the excuse of pop-up events that did happen but not like they claimed. In fact, most big events they know well in advance about backstage because people in the department are already talking about, they are working them.

Example

    Mary J. Blige concert we were told there was nothing for catering. A new, younger, white employee told me she was pouring wine for wine tasting for Mary J Blige, Ms. Blige had a green room because it was posted on Facebook with her present.

Post Malone, Lizzo was she came case others worked it.

I am attaching some documents to prove what I mean.

I do remember asking to work backstage for Michelle Obama, but two men low on the seniority list work it.

Since the opening of the area, it was to schedule by has seniority. There were certain room coworkers never saw because of seniority. Prestigious rooms for the catering department were.

Locker Room

Family Lounge

Board room

Back stage catering

Green rooms

Private/Exclusive

Also, this may coworkers look down on me as I was less than because I was not chosen.

## IV.    Exhaustion of Federal Administrative Remedies

A.    It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or my Equal Employment Opportunity counselor regarding the defendant's alleged discriminatory conduct on *(date)*

05/17/2022

B.    The Equal Employment Opportunity Commission *(check one)*:

☐    has not issued a Notice of Right to Sue letter.

☑    issued a Notice of Right to Sue letter, which I received on *(date)*

February 14, 2023                                                                 .
*(Note:  Attach a copy of the Notice of Right to Sue letter from the Equal Employment Opportunity Commission to this complaint.)*

C.    Only litigants alleging age discrimination must answer this question.

Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding the defendant's alleged discriminatory conduct *(check one)*:

☑    60 days or more have elapsed.

☐    less than 60 days have elapsed.


## V.    Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order.  Do not make legal arguments.  Include any basis for claiming that the wrongs alleged are continuing at the present time.  Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts.  Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages. Attach additional pages if needed.

I am no longer working for the company as of Februry 14, 2023. I have lost wages as well as lost wages during my entire tenure with the company due to discrimination is scheduling. I have sufftered sexual harrassment during my entire tenure with the company and the company was well aware of this behavior as it was the culture of the company.
Due to the company's inapprorpriate behavior I was subject to a hostile environment from management as well as coworkers.

Also, because of my age and race treated differently than others. My job performance was great and the clients liked me I have never had a disciplinary action taken against me just mistreatment for the company. I am asking the court to award me the max for punitive and exemplary damages.

I was look as less than from management and coworkers as I was not allowed to do certain shifts .

MIED ProSe 7 (Rev 5/16) Complaint for Employment Discrimination

**Additional Information:**

Dear Court,

I would like you to know I was discrimated for all reasons stated in my claim. I started with the Little Caesar's arena since they opened. Detroit District Sportservice, Inc went out of their way to try and make me quit by overlooking me. The culture of the arena is very hostile. The rascism is so blatant and if you complain you will really do not get shifts. We have a union but nothing gets done with them so you are in a lose/lose situation. I believe any reasonable person would have left a long time ago. The job was two blocks from my home. I have never been disicplined since working there. Once we helped this company get the arena up an going is when they started weeding out people. Management uses crude, profane, inapproiate language as well as the coworkers on a daily basis. I have suffered tremendously with this company.

You are not allowed to think or speak up for yourself or it is met with retailation. I was treated poorly because of my race, sex and age.

I have irrepairable damages and my current health status perpetrated due to treatment by Detroit District Sportservice.

This company encourages and rewards bad behaviors.

MIED ProSe 7 (Rev 5/16)  Complaint for Employment Discrimination

## VI.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.    For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: May 15                , 2023    .

Signature of Plaintiff

Printed Name of Plaintiff    Mona Matthews

EEOC Form 161-B (01/2022)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

# NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: | Mona Matthews<br>948 Temple Street<br>DETROIT, MI 48201 | From: | Detroit Field Office<br>477 Michigan Avenue, Room 865<br>Detroit, MI 48226 |
|---|---|---|---|

| EEOC Charge No.<br>525-2022-01381 | EEOC Representative<br>JOHNNIE KING,<br>Enforcement Supervisor | Telephone No.<br>313-774-0020 |
|---|---|---|

*(See also the additional information enclosed with this form.)*

### NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

> More than 180 days have passed since the filing of this charge.

> The EEOC is terminating its processing of this charge.

*Age Discrimination in Employment Act (ADEA): You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, the EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court <u>WITHIN 90 DAYS</u>** \*of your receipt of this Notice.\* Otherwise, your right to sue based on the above-numbered charge will be lost.*

*Equal Pay Act (EPA): You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.***

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Digitally Signed By:Michelle Eisele
02/14/2023

**Michelle Eisele**
**District Director**

Enclosures(s)

cc: **Misty R Martin**
**Seyfarth Shaw LLP**
**1075 PEACHTREE ST NE STE 2500**
**Atlanta, GA 30309**
**Abigail  Flynn-Kozara**
**250 delaware ave**
**BUFFALO, NY 14202**

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | EEOC<br>FEPA | 525-2022-01381 |

| Michigan Department Of Civil Rights | and EEOC |
|---|---|
| *State or local Agency, if any* | |

| Name *(indicate Mr., Ms., Mrs.)*<br>Ms. Mona Matthews | Home Phone<br>313-265-5156 | Year of Birth<br>1964 |
|---|---|---|

Street Address

948 Temple Street

DETROIT, MI 48201

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name<br>Delaware North global headquarters | No. Employees, Members<br>501+ Employees | Phone No. |
|---|---|---|

Street Address

250 delaware ave

BUFFALO, NY 14202

| Name | No. Employees, Members | Phone No. |
|---|---|---|

| Street Address | City, State and ZIP Code | |
|---|---|---|

| DISCRIMINATION BASED ON | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| | Earliest      Latest<br>10/01/2021      04/30/2022 |
| Retaliation, Sex, Race, Age | |
| | Continuing Action |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I began working for the above-named employer on or around July 1, 2017, as a Server. On or about January 29, 2022, a coworker grabbed my hand and made inappropriate sexual remarks to me. On or about January 30, 2022, the said coworker proceeded to attempt to make physical contact with me repeatedly by placing his hand on top of mine on the cart I was transporting. On or around February 1, 2022, I complained to the Catering Manager that I was being sexually harassed by my coworker. On or around February 25, 2022, I was retaliated against and placed out of the lounge and moved to another area which resulted in little to no tips and my shift was changed. On or around March 1, 2022, a grievance was filed with the Union. On or about March 9, 2022, a meeting was held with Human Resources, my Union Representative and the General Manager. As a result of this meeting, my coworker was suspended for 6 days. On or around October 1, 2021, through April 30, 2022, I was discriminated against and treated differently from my (younger Caucasian) coworkers who were given special treatment by being placed in premium lounge rooms. On or around April 27, 2022, I was not scheduled for shifts which were given to younger Caucasian women by the Assistant Manager. I believe I was discriminated against due to race, (African American), my sex (female), sexually harassed, and retaliated against due to participating in a protected activity in

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct.<br><br>**Digitally Signed By: Ms. Mona Matthews**<br>**05/17/2022**<br><br>*Charging Party Signature* | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | EEOC<br>FEPA | **525-2022-01381** |

| | |
|---|---|
| **Michigan Department Of Civil Rights** | and EEOC |
| *State or local Agency, if any* | |

violation of Title VII of the Civil Rights Act of 1964, as amended. I also believe I was discriminated against because of my age (40+), in violation of the Age Discrimination in Employment Act of 1967, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| **Digitally Signed By: Ms. Mona Matthews**<br><br>**05/17/2022** | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year)* |
| *Charging Party Signature* | |

 **Seyfarth**

Seyfarth Shaw LLP 1075 Peachtree Street, N.E.

Suite 2500
Atlanta, GA 30309-3958
T (404) 885-1500
F (404) 892-7056

mrmartin@seyfarth.com

T (404) 885-7984

www.seyfarth.com

July 22, 2022

**VIA EEOC RESPONDENT PORTAL**

Investigator Deanna Wooten
DEANNA.WOOTEN@EEOC.GOV
U.S. Equal Employment Opportunity Commission
477 Michigan Avenue, Room 865
Detroit, MI 48226

> **Re:   Mona Matthews v. Delaware North Global Headquarters EEOC Charge No.
> 525-2022-01381**

Dear Ms. Wooten:

This firm represents Respondent Detroit District Sportservice, Inc. ("Detroit District Sportservice" or the "Company", incorrectly identified as "Delaware North Global Headquarters"), in connection with Mona Matthews' ("Charging Party") charge of discrimination, referenced above (the "Charge"). This letter shall serve as Company's position statement in response to the Charge.[1]

NATURE OF THE CHARGE

In her Charge, Charging Party (a current Detroit District Sportservice employee) alleges that Company discriminated against her on the basis of race, sex and age; subjected her to a hostile

---

[1] This position statement is submitted to assist the Commission in investigating the above-referenced charge so that the charge may be resolved as expeditiously as possible. This position statement and accompanying documents are confidential and should not be disclosed to individuals or entities outside the Commission without Respondent's prior written consent, except as required to the Charging Party or Charging Party's legal representative, or in response to a valid Freedom of Information Act request. Inclusion of information in this position statement does not constitute a waiver of any objection or privilege Respondent may have in response to future discovery or information requests, or to the introduction of evidence in this or any subsequent proceeding; nor does it constitute a waiver of any objection as to timeliness of the complaint or any other legal argument Respondent may assert in the future. Furthermore, this position statement, although believed to be true and correct in all respects, does not constitute an affidavit or admission, and is not intended to be used as evidence in any court or other proceedings. Respondent retains its right to present new, revised, or additional facts or arguments or to respond to any new issues or evidence that may arise.

 **Cote**

working environment; and retaliated against her. Specifically, Charging Party alleges that a coworker made an inappropriate sexual gesture towards her and grabbed her hand on January 29, 2022 and, on January 30, 2022, attempted to make physical contact with her by placing his hand on the pushcart that she was transporting. After allegedly raising concerns to her Catering Manager, she claims that she was retaliated against when the Company placed her into a different work area and assigned her to shifts with little to no tips. Additionally, Charging Party claims that the Company gave special treatment and work assignments to younger Caucasian coworkers from October 1, 2021 through April 30, 2022.

Charging Party's allegations are devoid of merit. Contrary to Charging Party's claims, the Company did not discriminate against her on the basis of race, sex, age, or any other alleged protected category; subject her to a hostile working environment; or retaliate against her. As an initial matter, the Company did not give any special or preferential treatment to younger Caucasian coworkers. To the contrary, Charging Party has the second most seniority and has consistently been assigned to work in the Family Lounge area that she desires.

As to her hostile work environment claim, Charging Party raised a concern about her coworker and friend, Richard Shank (Male, African American, DOB 10/13/1966), which the Company promptly and thoroughly investigated. Based on its findings, the Company concluded that during a single instance, Mr. Shank displayed inappropriate and unprofessional gesture towards Charging Party. Mr. Shank was counseled, suspended for six days, and issued a Final Written Warning. Charging Party stated she was satisfied with the investigation and result and has not raised any further complaints regarding Mr. Shank's interactions with her.

As to retaliation, there is no merit to her claim. Charging Party is a union employee. She is guaranteed seniority in terms of picking her work shifts but there is no right under the union agreement for her be to be assigned to any particular work area. As explained in more detail below, any change in her work area or shift was made at her request and/or for a legitimate business need and had no relation to the concern she raised regarding Mr. Shank. Further, after she raised her concern, Charging Party's seniority remained the same and she was offered the same shifts and pay. For these reasons, and as detailed more fully below, the Commission should dismiss the Charge without further inquiry.

**FACTUAL BACKGROUND**

**A.     Respondent's Business Operations and Policies**

Since 2017, Respondent has provided food and beverage services at Little Caesar's Arena ("LCA") in Detroit, Michigan. The 20,000 seat venue is home of the NHL's Detroit Red Wings and the NBA's Detroit Pistons. Respondent provides concessions to more than 40 stands and premium dining services, including 24 boxes and 65 suites. Since 1930, Respondent also provides similar food, beverage and retail services at Comerica Park, home of the MLB's Detroit Tigers.


**Seyfarth** <sup>Cote</sup>

Investigator Deanna Wooten
July 22, 2022
Page 3

Respondent is an equal opportunity employer that expressly prohibits discrimination based on race, color, religion, age, sex, sexual orientation, disability, national origin, or any other category protected by law. These policies are contained in its Associate Handbook ("Handbook"), and disseminated to every associate. (Exhibit A, Associate Handbook, pgs. 16-17.) The Company is also committed to providing a productive work climate, free of harassment and discrimination and discrimination or harassment of any kind, by management or co-workers is not tolerated. (Id., pgs. 14-16.) Further, use of rude, obscene, profane, offensive, embarrassing, or abusive language towards co-workers, managers, or guests of clients is prohibited. (Exhibit B, Level III-Violations: Conduct, p. 2)

Additionally, Respondent's policies expressly prohibit retaliation against an Associate for reporting or complaining of a violation or a possible violation of Respondent's non-discrimination policy. (See Ex. A, p. 15). To that end, Respondent encourages its Associates to report any harassment or discrimination, or, if the Associate is not sure whether it is harassment or discrimination, Associates should still report it. (Id.) All complaints are to immediately be reported to Human Resources, the unit's General Manager or corporate Human Resources. Alternatively, if the Associate prefers, they can contact the Associate Hotline, the Company's confidential third party intake service. They can also contact the Associate Hotline if they are not satisfied with the resolution of their complaint or report at the unit level.

Respondent's progressive discipline policy, also known as the "Corrective Counseling" policy, sets forth guidelines for Associate discipline, utilizing a "progressive approach to discipline" that applies "increasingly severe measures for repeated violations of performance, conduct, and/or attendance deficiencies." (Id. at pgs. 27-28.) The purpose of corrective counseling "is to ensure that the Associate is fully aware of the issue and what improvement is expected, thereby enabling the Associate to avoid a recurrence of the issue." (Id., p. 28.)

**B.    Charging Party's Employment History With The Company**

Charging Party is female, African American and was born August 2, 1964. Respondent hired Charging Party on or about July 20, 2017. Based on Charging Party's qualifications as listed in her application, and after conducting an interview, Respondent hired Charging Party as a Catering Server at the LCA. In this role, Charging Party performs open, close, and side-work duties for food and beverage stations in various boxes and lounges, including but not limited to, preparing room and facilities prior to guest arrival, setting tables, clearing, cleaning, and sanitizing tables, and assisting in the setup of serving stations. Charging Party earns wages and tips in this role but her earnings are not based on any particular assignment. All the tips received are pooled and equally split among all servers who work any particular shift. Since July 20, 2017, Charging Party's direct supervisor has been (and currently is) Catering Manager, Mark Hjelmstad (Male, Caucasian, DOB: 04/25/1982).

Charging Party's position is a union position and the terms and conditions of her employment are governed by a Collective Bargaining Agreement ("CBA"). Pursuant to the CBA,

 **Seyfarth** Cote

employees do <u>not</u> have a right to choose the particular area where they want to work (e.g. assignment to a particular lounge or suite) but they are allowed to bid on a particular shifts based on seniority. In fact, the Union has requested that the Company not regularly assign employees to a particular work area as it causes confusion and issues with employees who then feel that they are entitled to a particular work assignment. Nevertheless, Charging Party has expressed a desire for, and has primarily been placed, assignment in the Family Lounge, which provides service to the players' families and spouses.

Over the last four years, Charging Party worked with Catering Server, Richard Shanks. Mr. Shanks was never her supervisor and at no time had any supervisory authority over her work. As reported by Mr. Shanks, he and Charging Party were close friends. They were never romantically involved, as far as the Company knows, and he reported thinking of Charging Party like a sister. Mr. Shanks would frequently walk Charging Party to her car at the end of her shifts to make sure she left safely. They also exchanged Christmas and birthday gifts. As for union seniority, Mr. Shanks ranked number 1 and Charging Party was number 2, meaning, out of the approximately thirteen servers, Mr. Shanks was given first choice of what shifts he wanted to work and Charging Party was given the second choice.

## C. Charging Party Reports Concern Regarding Her Co-Worker, Richard Shanks

On February 1, 2022, Charging Party called off work to Mr. Hjelmstad. Charging Party told Mr. Hjelmstad that she had a migraine due to working with Mr. Shanks. Mr. Hjelmstad called Charging Party to discuss her concerns. Charging Party was vague during the call and refused to provide any specifics regarding Mr. Shanks or her concerns. Charging Party never suggested or reported any concerns of alleged discrimination or sexual harassment. Mr. Hjelmstad asked Charging Party to provide a written statement detailing any concerns that she had so he could document them and conduct an investigation.

On February 2, 2022, Charging Party did not provide a written statement as she had been requested but instead asked to have a sit down meeting, which Mr. Hjelmstad agreed to schedule. On February 3, 2022, before the meeting could be scheduled, Charging Party again contacted Mr. Hjlemstad and complained that she was not assigned to the Family Lounge for all of her shifts that week. Mr. Hjlemstad explained that for staffing reasons (unrelated to Charging Party), the Company needed to train other employees in the Family Lounge to ensure that there were always other employees available who could handle working the area. Specifically, because the Family Lounge provided services to the players' families, the Company wanted to make sure there was always enough staff who were experienced enough to provide exceptional service in the Family Lounge. Mr. Hjlemstad pointed out to Charging Party that she was still assigned one of the Family Lounge shifts that week and it was his intention to have her continue to primarily work the Family Lounge when the training was over.

On February 4, 2022, Charging Party reported that she had COVID and, for this reason, Mr. Hjlemstad was unable to schedule a sit down meeting with her. On February 9, 2022, Charging



Party returned to work and met with Mr. Hjlemstad. She still refused to provide any detail regarding her concerns regarding Mr. Shanks. Instead, she repeated her complaint about not being assigned to the Family Lounge for all of her shifts and reported she felt she was being retaliated against for raising a concern about Mr. Shanks. Mr. Hjlemstad again explained that he was attempting to train other employees and also told her that the CBA did not require that she be assigned to any particular area. Nevertheless, he again told her that it was his intent to primarily assign her to the Family Lounge area in the future. Charging Party still seemed dissatisfied with this response. Mr. Hjlemstad acknowledged her dissatisfaction and encouraged her to file a grievance with the Union if she continued to have concerns. Again, Charging Party never raised any concerns regarding alleged sexual harassment or any form of discrimination.

On or about February 10, 2022, Charging Party contacted Human Resources Manager Asia Thomas (Female, 08/25/1993, African American).[2] Charging Party stated that she and Mr. Shanks were working together in January and he had grabbed her hand. Charging Party also claims that she made a comment to Mr. Shanks, who was sweeping, that he should keep that same energy when they go downstairs. In response, Charging Party claims Mr. Shanks grabbed towards his pelvic area in a way that insinuating "F off/F you". Charging Party then asked Mr. Shanks what he was doing and he replied he was grabbing his keys. Charging Party replied that he needed to find another place to put his keys.

Charging Party stated to Ms. Thomas that she did not want to get Mr. Shanks fired or reprimanded because she did not believe he acted maliciously. However, she did not think that he knew work etiquette and she wanted him talked to.[3] Ms. Thomas began an investigation and asked the managers to place Charging Party and Mr. Shanks on different work shifts (which they did) while her investigation was pending.

Mr. Shanks denied making any inappropriate gesture towards Charging Party or touching her. He stated that he and Charging Party were like best friends. According to Mr. Shanks, they goof around and banter with each other but it has never been sexual and he is not sexually attracted to her. There were no witnesses that corroborated that Mr. Shanks had ever touched Charging Party's hand or pushcart. However, one witness did describe seeing Mr. Shanks gesture towards his pelvic area in a way that could be perceived as offensive.

As a result of the investigation, Mr. Shanks was suspended for six days, counseled and issued a formal written warning.[4] (Exhibit C, Record of Associate Counseling.) He was returned to work on March 17, 2022 and was assigned to different work areas. Charging Party was informed

---

[2] Charging Party also never raised any complaints of discrimination based on her gender, race or age.

[3] Notably, for a period of time after these alleged incidents occurred, Charging Party had continued to have Mr. Shanks walk her to car at night.

[4] Mr. Shanks only had one prior counseling record, on February 2, 2022, where it was reported that he had been sleeping while on the clock.

 **Seyfarth** Cote

that an investigation occurred, action had been taken and she indicated that was satisfied with the Company's response to her concerns. The Company also offered that she could change departments, but she did not want to and she stated it was her preference to finish the season in catering. Charging Party did not and has not raised any further concerns about Mr. Shanks.

**D.   Charging Party's Work Assignments**

During 2021/2022, Charging Party frequently worked in the Family Lounge. This seems to be an area that servers liked to work because it gives them the opportunity to serve the family members of the players. Based on the Company's best estimate, it believes that Charging Party was assigned to the Family Lounge for 85-90% of her shifts. Again, the CBA does not provide for servers to select their assignments and all servers can and are assigned to different work areas.

As explained above, in February of 2022, the Company had begun training other associates to work the Family Lounge because it wanted to have flexibility and trained staff available to cover the Family Lounge. (For example, when Charging Party herself was out for oral surgery, COVID or called off of work, the Company needed other employees to work the Family Lounge.) This decision had no relation to Charging Party and, in fact, the decision to do this training occurred prior to Charging Party's February 1, 2022 communication to Mr. Hjelmstad that Mr. Shanks was giving her a migraine.

On February 10 - 17, 2022, Charging Party called off of work related to an oral surgery and recovery. Upon her return, she was scheduled to work three internal events (which did not require any Family Lounge coverage). On February 24, 2022, she worked the Family Lounge.  On February 25, 2022, she worked the press dining area for the Dua Lipa concert, which did not require any Family Lounge assignment. On February 26, 2022, she worked the Family Lounge.

When Mr. Shanks returned to work after his suspension and discipline, the Company honored Charging Party's request not to work with him and he was placed in a different work area. Charging Party continued to receive the same number of shifts, rate of pay and tip share she received before.

In March of 2022 Charging Party requested a personal leave of absence in order to pursue work hours at Comerica Park. The Company granted her leave request and said her decision to take a leave of absence would have no impact to her seniority or ability to return to the LCA in the Fall of 2022. On or about April 11, 2022, Charging Party stated she wanted to return to work at LCA. The Company responded it was happy to put her on the schedule but cautioned that there was not much work over the summer and most shifts only called for two servers.

On Tuesday, April 12, 2022, there was only one shift available in the catering department and it called for two servers, which would have been Mr. Shanks and Charging Party. However, the Company did not schedule Charging Party for this shift since she had said she did not want to work with Mr. Shanks and Mr. Shanks had more seniority for the shift selection under the CBA.

 **Seyfarth** Cote

Charging Party then changed her mind and stated that she would work with Mr. Shanks. Charging Party was put on the next shift but did not show up for work. She was then scheduled to work Wednesday, with five other people for a team serving event. Charging Party called out at 6:33

a.m. that morning stating she was not feeling well. On Thursday, April 21, 2022, she again improperly called out of work.

Since late April, Charging Party has since reported to work and has been placed on the schedule with no further complaints from her regarding her schedule, assignments, management or Mr. Shanks. At the time of her return, neither the hockey or basketball team made it to the finals so there were no other events that required Family Lounge servers. Charging Party does continue to work general areas, like all of the other servers.

**ARGUMENT**

*I. The Company Did Not Discriminate Against Charging Party Because Of Her Race, Sex Or Age.*

To establish a claim of race, sex or age discrimination, Charging Party must first show that: (1) she is a member of a protected class; (2) her job performance met the employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) the Company treated another similarly situated individual who was not of the same race, sex or age more favorably than Charging Party was treated.

With regard to the third element (adverse action), Charging Party's allegation that younger, Caucasian servers were treated differently than her and given special treatment from October 1, 2021 through April 30, 2022 by being placed in premium lounges is just not true. As noted above, Charging Party's work assignments are governed by the CBA. While she has seniority to choose her shift, she does not have the right to be placed in any particular work area. In fact, the Union has asked that the Company not regularly give employees the same work assignments as they find it causes issues. Nonetheless, Charging Party was primarily placed to work in the Family Lounge, the area of her choice, except for times when Charging Party called out of work or requested different assignments, no Family Lounge Shifts were available, or the Company was training other employees in that area. Additionally, to the extent that Charging Party claims that she was assigned different areas and received less wages/benefits, this is also not true. Tips are pooled and distributed equally among the team of servers, regardless of where the particular server is assigned. Thus, even when Charging Party did not work the Family Lounge, she was still entitled to the same share of tips. Thus, Charging Party has not suffered any adverse action and her discrimination claims fail.

Additionally, Charging Party has not and cannot identify any similarly situated employee who was treated more favorably than she was treated. All servers were assigned to work in different areas and there are no younger, Caucasian, or male servers that are only assigned to the

 **Seyfarth** Cote

Family Lounge. Quite the contrary, Charging Party has been assigned to the Family Lounge more than any other employee, which wholly undermines any claim of discrimination based on her age, race of gender. For this additional reason, Charging Party's claim fails.

Finally, even if Charging Party could establish a *prima facie* case of discrimination—which she cannot—her claim still fails because the Company had legitimate, non-discriminatory reasons for not always assigning Charging Party to the Family Lounge: (1) it was not obligated to under the CBA; and (2) it needed to ensure that other employees were trained to work the room to ensure that exceptional service was always extended to the players' family members. Charging Party does not offer any facts to suggest that this is not the real reason for the Company's decision and, in fact, her own inability to work at times (due to COVID or needing surgery) simply underscores the importance of having other employees adequately trained for that area. Mr. Hjelmstad explained these reasons to Charging Party but also stated that he plans to primarily have Charging Party continue to serve the Family Lounge, which he has done. Additionally, it is significant that Charging Party never raised any complaint about her race, gender or age having any relation to the staffing decisions made by the Company and there is absolutely no evidence that any discriminatory comments have been made towards or about Charging Party. To the contrary, the Company continues to value her work and continued to assign her to one of the most important areas in its venue. Finally, it is significant to note that Mr. Hjelmstad has been Charging Party's supervisor since July 2017. It is nonsensical that they would work together for five years and suddenly, Mr. Hjelmstad would decide to start discriminating against her because of her race, age and sex. Charging Party's conclusory allegation that the Company's scheduling decision was based on her race, sex or age is nothing more than unsupported speculation and is wholly insufficient to establish pretext.

II.     *The Company Did Not Retaliate Against Charging Party.*

To establish a *prima facie* case of retaliation, Charging Party must show that: (1) she engaged in a protected activity; (2) the Company knew of the protected activity; (3) the Company took an adverse employment action against Charging Party; and (4) a causal link between the protected activity and the adverse employment action.

With regard to the first element, Charging Party's initial concerns raised to Mr. Hjelmstad February 1-4, 2022 do not constitute protected activity. Charging Party complained that Mr. Shanks gave her a migraine but provided no details as to how or why and she certainly did not suggest she was being mistreated due to her age, sex or race. (In fact, Mr. Shanks is also above the age of 40 and African American.) Merely complaining in general terms, without indicating a connection to a protected class or providing facts sufficient to create that inference, is simply not protected activity. *See e.g. Offutt v. Warren County Reg'l Jail*, 109 F. App'x 740, 743 (6th Cir. 2004) (finding no protected activity under Title VII where employee "never indicated that her opposition was based on Title VII"). For this initial reason, Charging Party's retaliation claim fails. And because Charging Party did not engage in any protected activity, she, likewise, cannot establish the second element of her claim -- that the Company knew of her protected activity.



Investigator Deanna Wooten
July 22, 2022
Page 9

With regard to the third element, there was no adverse action. Before and after Charging Party raised concerns about Mr. Shanks, she remained employed by the Company, and was still afforded shifts, work assignments and pay in conjunction with the CBA. In fact, the Company allowed Charging Party to take a personal leave of absence and allowed her to return without any impact to her position or seniority. Finally, Charging Party continues to be employed by the Company. Because Company took no adverse action against Charging Party, her retaliation claim fails as a matter of law. For these reasons, Charging Party is unable to establish the third prong of her *prima facie* case.

In addition, there is a complete absence of any evidence suggesting a causal connection between Charging Party's supposed protected activity and her assignments to the Family Lounge. Even if the February 1, 2022 meeting with Mr. Hjelmstad constituted protected activity, which it does not, the decision to start training other employees in that area pre-dated their discussion and had absolutely nothing to do with Charging Party. Accordingly, because Charging Party cannot establish a causal link, her retaliation claim should be dismissed.

Even assuming Charging Party could establish a *prima facie* case of retaliation (which she cannot), her claim still fails because, as discussed above, she cannot show that any of the Company's decisions regarding her employment were a pretext for unlawful retaliation. There were no discriminatory comments made towards or about Charging Party. The Company continued to place her on assignment in one of the most important areas that it services. Thus, her retaliation claims against Company are without merit and her Charge should be dismissed.

III.    *The Company Did Not Subject Charging Party To A Hostile Working Environment.*

To establish a *prima facie* case of hostile work environment, Charging Party must show that: (1) she was subjected to a hostile or offensive work environment; (2) the conduct was based on her protected status; (3) the conduct was sufficiently severe or pervasive to alter the terms or conditions of her employment; and (4) at the time such conduct occurred and as a result of such conduct, she subjectively perceived his or her work environment to be abusive, as well as a basis for employer liability.

Charging Party cannot establish a hostile work environment claim because her allegations, even if true, fall far short of the required "severe and pervasive" standard. In support of her claim, Charging Party points to Mr. Shanks touching her hand and then her push cart on two days and to one inappropriate gesture. Even if Charging Party was subjected to the conduct she alleges occurred (allegations which the Company denies), that conduct is neither sufficiently severe nor pervasive to alter the terms and conditions of Charging Party's employment so as to create an abusive environment. For example, one inappropriate comment and a few attempts to touch her hand while she was pushing a cart is simply not pervasive or severe. Federal laws are not intended to protect employees from isolated incidents or alleged harassment that is not objectively offensive. For this reason alone, Charging Party's harassment claim fails.



Investigator Deanna Wooten
July 22, 2022
Page 10

Additionally, there is no indication that the conduct she points to in support of her harassment claim was directed towards her *because of* her sex. Notably, Charging Party does not allege that anyone at the Company ever made any negative comments to her about her sex. Moreover, to the extent that Charging Party generally complains about her working environment (*e.g.*, her work assignment), there is absolutely no reason to believe that this alleged conduct had anything to do with, or was directed toward Charging Party because of, any protected characteristic.

Even if Charging Party's allegations could rise to the level of actionable harassment (and they cannot), the Company cannot be held liable for any of the alleged harassment because it maintains robust policies against harassment and discrimination, as well as procedures setting forth different ways employee may complain about perceived policy violations. When Charging Party did raise a complaint, it was immediately and thoroughly investigated, addressed and Charging Party was satisfied with the result.

Because Charging Party alleges that Mr. Shanks harassed her and he was not Charging Party's manager, any harassment claim must be analyzed under the negligence standard appropriate for alleged co-worker harassment. Charging Party, however, cannot establish that the Company was negligent in discovering or remedying the alleged harassment for several reasons. First, the Company took reasonable care to prevent any alleged harassment by maintaining a comprehensive anti-harassment policy (which includes numerous reporting mechanisms and prohibits retaliation) and distributing copies of the policy to employees. Charging Party and Mr. Shanks both received copies of the policy. Second, as noted above, upon receiving Charging Party's complaint, the Company took prompt remedial action by conducting a thorough investigation. While the investigation only suggested that Mr. Shanks made one inappropriate gesture in front of Charging Party, the Company still took immediate corrective steps by counseling, suspending and disciplining Mr. Shanks and then ensuring that Charging Party and Mr. Shanks did not work on the same shift if / until Charging Party requested otherwise. Following these remedial actions, the Company did not receive any further complaints from Charging Party and, thus, she appears to be satisfied with the actions taken.

In addition, the Company is not liable for any alleged harassment because the alleged incidents, even if they actually occurred (which the Company contests), did not culminate in any tangible employment action. To that end, Charging Party remains employed by the Company. For all these reasons, Charging Party's harassment claim fails.

## CONCLUSION

As demonstrated above, Charging Party's Charge is without merit. Accordingly, the Company respectfully requests that Matthews' claims be dismissed in their entirety.

In this response, the Company has sought to comprehensively address the allegations contained in Charging Party's charge. However, to the extent that the Company's response does

 **Seyfarth** Cote

Investigator Deanna Wooten
July 22, 2022
Page 11

not specifically respond to any particular allegation in the Charge, the Company hereby expressly *denies* such allegation.

Please contact me if you have any questions, or if Charging Party raises any new allegations or presents additional evidence to which Company has not had the opportunity to respond.

Investigator Deanna Wooten
July 22, 2022
Page 11

Sincerely,

SEYFARTH SHAW LLP

*/s/ Misty R. Martin*

Misty R. Martin

Attachments


Cote

# EXHIBIT A



# Associate Handbook

Revised July 2019

# SECTION I: COMPANY POLICIES

## ANTI-HARASSMENT AND NON-DISCRIMINATION

The Company is committed to providing a productive work climate, free of harassment and discrimination. Accordingly, discrimination or harassment of any kind by management and coworkers at any level, will not be tolerated. In addition, the Company will protect Associates, to the extent possible, from reported harassment in the workplace by non-Associates.

### Prohibited Forms of Harassment

Harassment is verbal, written or physical conduct which makes fun of, belittles or shows hostility or dislike to an individual because of his or her race, color, religion, sex (including, but not limited to, pregnancy, pregnancy-related condition, sexual and reproductive health choices, gender identity, transgender status and sexual orientation), national origin, age, disability or perceived disability, (including, but not limited to, gender dysphoria), marital status, domestic violence victim status, familial status, genetic information, or veteran status, or any other basis protected by applicable law, or that of his or her relatives, friends or associates, and which:

- has the purpose or effect of creating an intimidating, hostile or offensive work environment;
- has the purpose or effect of unreasonably interfering with another individual's work performance;
- otherwise adversely affects an individual's employment opportunities.

Harassing conduct includes, but is not limited to, the following:

- Epithets, slurs, negative stereotyping, degrading comments, threatening, intimidating or hostile acts (even if claimed to be "jokes" or "pranks" and even if not directed at a particular individual) which relate to race, color, religion, sex (including, but not limited to, pregnancy, pregnancy-related condition, sexual and reproductive health choices, gender identity, transgender status or sexual orientation), national origin (including, but not limited to, an individual's difficulty in speaking the English language), age, disability or perceived disability, (including, but not limited to, gender dysphoria), marital status, domestic violence victim status, familial status, genetic information or veteran status; and

- Written or graphic material (including, but not limited to, computer images) which makes fun of, belittles or shows hostility or dislike toward an individual or group because of race, color, religion, sex (including, but not limited to, pregnancy, pregnancy-related condition, sexual and reproductive health choices, gender identity, transgender status or sexual orientation), national origin, age, disability or perceived disability (including, but not limited to gender dysphoria), marital status, domestic violence victim status, familial status, genetic information, or veteran status which is displayed, shown or circulated in the workplace.

Any harassment of Company Associates is a violation of this Policy and is absolutely prohibited and will not be tolerated.

**Sexual Harassment**
Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when:

- It is directly or indirectly implied that submission to such conduct is a requirement or condition of an individual's employment; or

- It is directly or indirectly implied that submission or rejection of such conduct will have a bearing on employment decisions involving the individual; or

- Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.

For example, the following kinds of behavior, or others with a similar harassing effect, are absolutely prohibited:

- Abusing an Associate through insulting or degrading sexual remarks, jokes, innuendoes, or other sexually oriented conduct, whether or not directed at a particular individual (including, among other things, graphic or descriptive comments relating to an individual's body or physical appearance, sexually oriented teasing or pranks, improper suggestion, objects, pictures or computer images, or unwanted physical contact); or

- Threats, demands or suggestions that an Associate's work status depends in any way upon tolerating or accepting sexual advances or sexually oriented conduct.

**Discrimination**
Discrimination is adverse treatment of an associate based on his or her race, color, religion, sex, (including pregnancy, pregnancy-related condition, sexual and reproductive health choices, gender identity, transgender status and sexual orientation), national origin, age, disability or perceived disability (including, but not limited to, gender dysphoria), marital status, domestic violence victim status, genetic information, or veteran status, or any other basis protected by applicable law, or that of his or her relatives, friends or associates, or association with someone in such a protected group, rather than on the basis of his or her individual merit, with respect to the terms, conditions, or privileges of employment including, but not limited to hiring, firing, promoting, disciplining, scheduling, training or deciding how to compensate the associate.

**Retaliation**
Retaliation against Associates for exercising their rights under this policy is also strictly prohibited and will not be tolerated. This would include retaliation against Associates for inquiring about their rights, or making an honest report or complaint of a violation or possible violation, or for truthfully assisting in a complaint investigation. Any form of retaliation will be subject to appropriate disciplinary action up to, and including termination. The Company encourages Associates to advise the Company

immediately if there appears to be any form of retaliation as a result of reporting or participating in the investigation of a harassment or discrimination complaint.

**Complaint Procedure**

The Company does not and will not tolerate harassment or discrimination. Any Associate who is subjected to harassment or discrimination or who witnesses harassment or discrimination is expected to report it. If an Associate is not sure whether it is harassment or discrimination, the associate should report it. Supervisors and Managers are required to immediately report complaints or knowledge of harassment or discrimination to unit Human Resources, their unit General Manager or corporate Human Resources. Unit Human Resources or General Managers are also required to report any complaints of harassment, retaliation or discrimination to the Associate Hotline. Failure of supervisors or managers to report harassment can result in disciplinary action, up to and including termination in the appropriate situation.

Associates who believe they have been subjected to harassment or discrimination or witness such conduct can discuss their concerns with unit Human Resources, any manager or supervisor at the unit, or the corporate Human Resources Department at 1-800-828-7240. If the Associate prefers, they can contact the Associate Hotline at 1-800-441-5645, the Company's confidential third party intake service. They can also contact the Associate Hotline if they are not satisfied with the resolution of their complaint or report at the unit level.

Complaints and the investigatory process will be kept confidential to the extent possible, given the need to conduct an adequate investigation. After initially determining the facts, an investigation will be conducted in a thorough, timely and impartial manner. All investigations will be conducted by Human Resources Professionals or, if circumstances require, with the assistance and guidance of Corporate Human Resources. If an Associate has been found to have violated this policy, appropriate disciplinary action will be taken, including, but not limited to termination.

## EQUAL EMPLOYMENT OPPORTUNITY

The Company is committed to the principles of fair employment practices and equal employment in the work place.

The Company provides equal opportunity in employment practices for all persons and prohibits discrimination in employment practices because of race, color, religion, age, sex (including, but not limited to, pregnancy, pregnancy-related condition, sexual and reproductive health choices, gender identity, transgender status and sexual orientation), disability or perceived disability (including, but not limited to, gender dysphoria), national origin, marital status, domestic violence victim status, familial status, genetic information or veteran status, , or any other category protected by law.

The Company's policy not to discriminate on the basis of a person's race, color, religion, age, sex (including, but not limited to, pregnancy, pregnancy-related condition, sexual and reproductive health choices, gender identity, transgender status and sexual orientation), disability or perceived disability (including, but not limited to, gender dysphoria), national origin, marital status, domestic violence victim status, familial status, genetic information or veteran status, or any other category protected by

law, extends, but is not limited, to the following: recruiting, hiring, training, on the job treatment, performance evaluation, promotion, transfer, demotion, termination, pay, and terms and conditions (or privileges) of employment.

No Associate will aid, abet, compel, coerce or conspire to discharge or cause another Associate to resign because of the Associate's race, color, religion, age, sex (including, but not limited to, pregnancy, sexual and reproductive health choices, gender identity, transgender status and sexual orientation), disability or perceived disability (including, but not limited to, gender dysphoria), national origin, ancestry, marital status, domestic violence victim status, familial status, genetic information or veteran status, or any other category protected by law.

At a minimum, the Company will take such affirmative action as is appropriate to ensure that all Associates will be employed in positions consistent with their skills, education, experience and interests. Every Associate of the Company with supervisory responsibilities will be held responsible to ensure that all areas under his or her control are administered without regard to race, color, religion, creed, age, sex (including, but not limited to, pregnancy, gender identity, transgender status or sexual orientation), disability or perceived disability (including, but not limited to gender dysphoria), national origin, ancestry, marital or veteran status, genetic information, or any other category protected by law.

Any Associate who feels that he/she has been or is being subjected to discrimination and any Associate having knowledge of conduct that could be considered discriminatory, should report such conduct to his/her manager, or the Corporate Human Resources Department. Managers must notify the Corporate Human Resources Department of any reports they receive. All reports of discrimination will be investigated promptly by the Corporate Human Resources Department in conjunction with the Corporate Law Department. Where necessary, appropriate action will be taken to prevent and remedy any such conduct.

Willful violation of this policy on equal employment opportunity by an Associate of the Company will be cause for disciplinary action, up to and including termination.

The required Equal Employment Opportunity Federal Poster is posted at the unit.

## REASONABLE ACCOMMODATIONS

The Company will attempt to make disability-related workplace accommodations consistent with federal and state legal requirements. Any qualified applicant or Associate with a disability who requires an accommodation to perform the essential functions of his or her job should contact either a member of the management staff or the Human Resources Department to request an accommodation. After a request for an accommodation is made, the Company will discuss the requested accommodation and other possible accommodations with the individual in an effort to find a reasonable accommodation that will allow him or her to continue with the hiring process or, as the case may be, perform the essential functions of the job without creating undue hardship for the Company.

The Company will also attempt to reasonably accommodate the sincerely held religious beliefs or practices of applicants and associates pursuant to federal and state law. Any individual who requires a religious accommodation should notify a member of management or the Human Resources

Department.   An Associate will be required to utilize a vacation/PTO day, if available, to accommodate a day off for religious observation.

## LACTATION BREAKS

Unless state law requires greater benefits, the Company will provide a reasonable amount of break time to accommodate an Associate who wants to express breast milk for the Associate's infant child and a private place to do so.  This break time shall run concurrently with break time already provided, if possible.  Break time that does not run concurrently with break time already provided shall be unpaid.  The Company may deny a request for such break time if it would seriously disrupt the Company's operations.

separate their employment responsibilities from their personal relationship in order to protect the interests of both Associates and others.

Failure to disclose a close personal relationship may result in the termination of employment of one or both of the individuals involved in the relationship. The Company will take into account the positions of the associates and the associate with managerial authority will be held to higher expectation in terms of reporting obligations.

## CONFIDENTIALITY

Associates must maintain the confidentiality of all confidential or proprietary information entrusted to them by the Company or its customers, vendors, suppliers, partners and agents, except where disclosure may be required by law. Confidential information includes all non-public information that might be of use to competitors or harmful to the Company or its customers, vendors, suppliers, partners and agents if disclosed. This includes – but is not limited to – financial information, business and strategic plans, information regarding potential bids or acquisitions, client and customer information and information relating to pricing, products and services. Confidential information must be held in the strictest confidence, and must not be used in any improper way.

Improper disclosure of confidential information to any internal or external person or entity – including media, former employees, competitors, suppliers or others – is strictly prohibited. To avoid inadvertent disclosure of confidential information, Associates are not permitted to discuss confidential information with or in the presence of any unauthorized persons, including without limitation employees of other companies operating within a shared facility, family members or friends. Associates should never discuss confidential information in public areas, such as public transportation or restaurants, even if Associates believe that no one else will know what he or she is talking about. Additionally, confidential information should only be disseminated to other Company associates on a need-to-know basis.

This obligation to preserve confidential information continues even after employment with the Company ends.

Additionally, all documents, inventions, creations and other work product generated by an associate using company resources during any period of time for which he or she is compensated by the Company are the property of the Company. This includes documents, contact lists, financial projections, business plans, budgets, engineering drawings, reports, books and records. The duplication or retention of such materials for personal use upon termination is prohibited. All supplies and equipment provided to Associates by the Company are company property, shall remain on Company-controlled property and shall not be removed unless it is necessary to do so in the furtherance of Company business. All Company property is to remain with or be returned to the Company upon termination.

## CORRECTIVE COUNSELING

In order to establish uniformity of corrective counseling, the Company has established guidelines, which should be consulted in cases of Associate discipline. Each individual case is different;

27

therefore, the guidelines provide sufficient latitude in dealing with the issue while still maintaining internal consistency. The Company generally follows a progressive approach to discipline, applying increasingly severe measures for repeated violations of performance, conduct, and/or attendance deficiencies. Management is not bound by progressive counseling steps and may forgo or repeat steps based on the severity of the conduct and any mitigating circumstances. Serious offenses may result in immediate termination. When the recommendation is termination of an Associate's employment or an elevated level of counseling due to a gross conduct infraction, management should contact the Corporate Office Human Resources Department/Employee Relations prior to initiating the corrective action.

### Corrective Counseling Philosophy:

All associates of the Company are to be treated with the utmost dignity and respect. Rules, policies and procedures exist in order to ensure a safe, positive working environment. Should an associate violate one of the company's rules, procedures or policies, it is imperative that the counseling is administered in a fair, consistent and equitable manner. Corrective counseling follows a progressive approach which provides the opportunity to correct, retrain and educate the associate under the standards established; it is not to be used as a punitive measure.

A counseling is a document that serves to inform an Associate of issues that are not acceptable. It gives notice to the Associate that such issues will not be tolerated and that further action will be taken if issues persist. A counseling should precede a termination except where an Associate commits a serious policy violation. The purpose of issuing counseling is to ensure that the Associate is fully aware of the issue and what improvement is expected, thereby enabling the Associate to avoid a recurrence of the issue. Any level of counseling, including the verbal counseling, termination counseling and suspension, must be recorded on the Record of Associate Counseling form, discussed with and signed by the Associate and/or signed by the witness and the manager administering the counseling, and placed in the Associate's personnel file.

## DISTRIBUTION OF INFORMATION

The Company is concerned about the confidentiality and security of its Associates and of the Company itself. Unless required by law, Associates may <u>not</u> provide any of the following information to outside sources:

- Company financial, proprietary or other confidential information not otherwise available to persons or companies outside of the company;
- References for current or past Associates, verbal or in writing; and
- Credit-related information.

Any questions regarding the appropriate response to requests for such information should be directed to the Corporate Human Resources department and/or the Corporate Law Department.

## ELECTRONIC DEVICES

Use of iPods, iPad, tablets, MP3 players, tape players and tape recorders, head phones, radios, televisions, DVD players, cell phones, beepers, or any other personal communications equipment is not permitted at any time unless used in conjunction with one's job and otherwise authorized by

28

# EXHIBITB



# Corrective Counseling
# List of Offenses &
# Expiration of Offenses

## *LEVEL III – Violations that warrant an Indefinite Warning or Termination*

## List of Offenses by Category

### Attendance
- No Call/No Show

Note: A doctor's note does not necessarily excuse the absence. Please refer to the unit's House Rules or Collective Bargaining Agreement for further information.

### Conduct
- Use of rude, obscene, profane, offensive, embarrassing or abusive language *toward* coworkers, managers, guests or client.
- Making or publishing false or malicious statements concerning any Associate, manager, guest, client, the public, the Company or its operation.
- Unauthorized removal of Company records, Associate lists, or confidential information of any kind.
- Taking the property or money of another Associate, person, or the Company; this is considered theft or misappropriation.
- Mischief, wrestling, pushing, throwing items, rough-housing, or any other kind of horseplay that endangers another associate health or safety or damages company property as a result of it (Performing an unsafe act).
- Unauthorized possession or use of firearms, concealed knives, explosives, or any other weapons, lethal or non-lethal, while on company premises, company business or during working hours (*Company Policy 240 "Workplace Violence"*).
- Acts of physical violence, fighting, or endangering the health and/or safety of others. An Associate who threatens, intimidates, coerces, or interferes with the work of fellow Associates, managers, guests, or clients that could adversely affect the Company's business (*Company Policy 240 "Workplace Violence"*).
- Willful neglect, damage, destruction, defacing, misuse, or sabotage of Company property.
- Insubordination: Arguing with a manager, disrespecting a manager or supervisor, or unwillingness to carry out a direct and reasonable request of a manager.
- Working under the influence of illegal drugs or alcohol, or possession of illegal drugs or alcohol. (*Company Policy 245.20 "Unauthorized Use of Drugs and or Alcohol"*).
- Misuse, alteration, concealment, falsification, or willful omission, from any Company record or report.
- Viewing or downloading pornographic material on company computer equipment or navigating systems including Internet, Intranet and Extranet-related systems (*Company Policy 247.00 "Acceptable Systems Use Policy"*).
- Intentionally falsifying Company Expense Reports (*Company Policy 232.00 "Reimbursable Business Expenses"*).
- Failure to disclose a close personal *romantic or intimate* relationship (*Company Policy 213.10 "Close Personal Relationships Between Associates In Line of Authority"*). *Handbook states: failure to disclose may result in the termination of employment of the individuals involved in the relationship.*
- Giving away and/or taking food is considered to be theft and will result in termination.

*(Associate Handbook: Free food and merchandize section)*

- Providing current or former associate information in a malicious or intentional manner such as associate lists or names, Company financial, proprietary or other confidential information and/or Credit-related information, either in verbal or in writing.
- Violation of Delaware North Companies Anti Harassment Policy (*Company Policy 107.00 "Anti Harassment"*).
- Any form of Electronic harassment such as creating, downloading, posting or dissemination of harassing, threatening, discriminatory or defamatory messages or material (*Company Policy 107.00 "Anti Harassment"*).
- Failure to comply with the Refilling of cups Policy.  Refilling of cups constitutes the sale of a beverage in a used, washed, soiled or unauthorized cup; or Possession of a used, washed, soiled or unauthorized cup in a stand or bar.  Cups are to be crushed and removed from the counter after use and before placing in trash receptacles.  Soiled or defective cups should be crushed and accounted for appropriately. (*See Associate Handbook page 36*).
- Poor hygiene / poor housekeeping that results in violation of health codes, a fine, or that endangers the health of customers and/or others.
- Failure to follow proper call in procedures for instances of "No call/No show" that are considered excused. Please note: A doctor's note does not necessarily excuse the absence. Please refer to the unit's House Rules for further information.
- Inexcusable carelessness of work / Gross Negligence (i.e. uncleaned spills, not using safety devices, etc.).
- Participation in activities which violate the company's Code of Conduct policies.
- Indecent or disorderly conduct, inducing immoral behavior, or creating a disturbance.
- Using another associate's time card, clocking in for another associate, or asking another associate to clock in for him/her.
- Failure to cooperate in formal investigations conducted by the company or governmental agency.
- Soliciting or accepting promotional items offered by the Company or its respective clients. Socializing, eliciting/accepting services or autographs/promotional items from players, a player's family, or other celebrities or agents of the building tenants.
- Job Abandonment constitutes as leaving the premises without informing management.
- Offense which reason, morals, or common sense indicates to be seriously harmful to the company, associates, and/or customers

*Disclaimer: the above list is not all-inclusive, but does cover most of the offenses under Level III.*

# EXHIBITC

**Record of Associate Counseling**

Confidential

| Last Name | First Name | Empl ID # |
|---|---|---|
| Shanks | Richard | 395752 |

| Unit | Department | Date |
|---|---|---|
| LCA | Catering | 03/16/2022 |

**Step in Progressive Counseling (check one):**

☐ Verbal  ☐ Written  ☒ Final  ☐ Suspension Pending Investigation  ☐ Termination

**Nature of Infraction (check applicable area):**

☐ Attendance  ☐ Performance  ☒ Conduct  ☐ Cash Handling  ☐ Alcohol Service  ☐ Credit Card Handling

**Dates of Previous Counseling (use exact dates, counseling step and the nature of the infraction):**

02/02/2022 Written Conduct
03/10/2022 Suspension Pending Investigation

**Written Summary (include the policy, specifically describe the violation, including dates, who, what, when, why, etc. and how this action violates the policy):**

Delaware North's Associate Conduct policy states, "The following behavior and/or actions are prohibited, will not be tolerated and will result in discipline up to and including termination: Use of rude, obscene, profane, offensive, embarrassing, or abusive language toward co-workers, manager, guests or client." Delaware North's Anti-Harassment and Non-Discrimination policy states, "The Company is committed to providing a productive work climate, free of harassment and discrimination. Accordingly, discrimination or harassment of any kind by management and co-workers at any level, will not be tolerated."

On 03/04/2022, it was brought to management's attention that you may have behaved in an inappropriate manner in the workplace. An investigation was conducted and you were suspended pending investigation. It was determined that you displayed inappropriate and unprofessional conduct towards another associate which was perceived as offensive.

Your behavior was unacceptable, shows poor judgment, is a violation of policy, and will not be tolerated.

**Action To Be Taken (effective immediately, expiration of offense, dates of follow up):**

This is a final counseling for your conduct. Effective immediately, you are expected to adhere to all company policies. You are expected to utilize appropriate language and treatment toward co-workers, associates, managers, guests and our client at all times. You are expected to treat all individuals with professionalism, respect and courtesy. If there are further conduct violations you may be subject to further corrective action, up to and including termination of employment. If there are no other conduct violations within the next 12 months, you will be removed from corrective counseling.

**Employee's Comments:**

Employee Signature/Date  3/17/2022

Manager/Supervisor Signature/Date  3.17.22

HR/Witness Signature/Date  3/17/2022

Print Manager/Supervisor Name  Mark Hjelmstad

Print HR/Witness Name  Asia Thomas

**Record of Associate Counseling**
**Confidential**

| Last Name | First Name | Empl ID # |
|---|---|---|
| Shanks | Richard | 395752 |

| Unit: LCA | Department: Catering | Date: 03/10/2022 |
|---|---|---|

**Step in Progressive Counseling (check one):**

☐ Verbal ☐ Written ☐ Final *X* Suspension Pending Investigation ☐ Indefinite ☐ Termination ☐ Note to File

**Nature of Infraction (check applicable area):**

☐ Attendance ☐ Performance *X* Conduct ☐ Cash Handling ☐ Alcohol Service ☐ Credit Card Handling

**Dates of Previous Counseling (use exact dates, counseling step and the nature of the infraction):**

02/02/2022 Written- Conduct

**Written Summary (include the policy, specifically describe the violation, including dates, who, what, when, why, etc. and how this action violates the policy):**

Richard was accused of making an inappropriate gesture towards a coworker in the Gondola pantry, making that co-worker to feel uncomfortable. The gesture was said to be a grab in his pelvic area insinuating "F off/F you".

**Action To Be Taken (effective immediately, expiration of offense, dates of follow up):**

Richard is being suspended pending investigation. Richard will be contacted once investigation is complete.

**Employee's Comments:**

_Richard Shanks_ 3\10\2022     _[signature]_ 3/10/2022
Employee Signature/Date          Manager/Supervisor Signature/Date

_Asia Thomas_ 3/10/2022          _____
HR/Witness Signature/Date         Print Manager/Supervisor Name

_Asia Thomas_
Print HR/Witness Name

My complaint is on January 29, 2022 Richard Shanks grabbed my hand in the office in the presence of the Assistant Manager Kobby Paul while we were signing a protocol sheet. When Richard grabbed my hand, I jerked it back and the assistant manager says, wow, Ms. Mona is feisty today. Did not make any comment about him grabbing my hand. The Manager's Mark Hempstead's door was open and in plain view of us and did not make a comment about Richard touching me. Later that day during the shift Richard was sweeping and I made the comment keep that same energy for tomorrow when we work the Family Lounge (Because Richard was a slacker and did not like to work the lounge) Richard then grabbed his penis and shook it at me. I said to Richard we have had this conversation before and I stated to you there would be consequences if it happened again. Richard stated what I'm looking for my keys. There were two people who witnessed this, a supervisor and a coworker. The coworker said Richard you need to find somewhere else to put your keys. The supervisor did not say one word. The supervisor Alex Yorkley is a friend and former colleague of the Catering manager. January 30, 2022 Richard did not ATTEMPT to make physical contact with me Richard DID make physical contact with me by placing his hand on top on mine 3 times on a stable dessert cart we were standing behind less than 2 feet apart. I jerked it away each time a representative for the Detroit Pistons was present. I walked away Richard followed me and when I tried to return to the entryway Richard blocked me with his body so I had to walk around to the other entrance to return to the cart. Richard continued to make rude and crude inappropriate comments the rest of the shift. I was going to tell the manager at the end of the shift. After telling the manager Mark Helmstead of the incidents which I felt he already knew that happened the prior weekend per Alex, I was retaliated against. I was placed on shifts that did not make full gratuity and new white employees were working a shift with full gratuity for the week. The company also gave special treatment to and work assignments younger New, Mostly Caucasian women coworkers from October 1, 2021 through April 30, 2022 and till present.

I am a Black American of African descent, over the age of 40, female with a breathing disability. My appearance is of my natural state. Natural hair, face and nails. I was discriminated against because of these factors, denied shifts and told I needed to do something with my hair, nails and face, this also subjected to a hostile work environment and retaliated against. The company did and continues to give preferential treatment to younger Caucasian coworkers. At the time I was second most seniority and had consistently worked the Pistons Family Lounge for 3 years however with the new hires and friends of management they felt they should be working the Pistons Lounge and how dare that I only worked it with my partner. So, management after my allegations consistently put others in the lounge rotating people which was uncharacteristic to the way we had been running the lounge. My complaints are not limited to the Family Lounge but other areas that I have never had the opportunity to work. I had asked about working these areas and asked if I could train on them but it never happened and I watch new employees working them and people from other departments work them which created more of a hostile environment.

I was subjected to a hostile work environment with the daily sexual comments, inappropriate gestures and touching with Richard Shanks. Also, profane and inappropriate language from management and coworkers, it is a very unprofessional environment. Richard

was a Coworker not a friend. The company did not act promptly and did not do a thorough investigation which lead to a more hostile environment. It was over a month after my allegations and not until I sent an email to corporate and filed a grievance before the company started to investigate. However, when company did investigate Richard was suspended for 6 days which Richard did not serve the entire suspension. Richard bragged to me that he was called in to work during the suspension and worked double shifts on at least two days. I also experienced a hostile work environment as the company did not follow the Collective Bargaining Agreement in regards to scheduling by seniority and maxing out the work schedule with intent of becoming full time scheduling from top to bottom like all the other union departments which caused me to lose $15,000 this last season alone. I was subjected to cursing and abusive language from assistant manager and coworkers and lawlessness. I was also retailed against when I reported that the assistant manager was stealing merchandise from the Piston's which I witnessed. I asked the company to look at video footage but that never happened making me to look like I may have taken the merchandise. It was a hostile environment when the company would skip over me and schedule someone else. The new other employees did not like me because they didn't want seniority to be followed they were friends of management and this caused a hostile environment.

I was retaliated against. I am a union worker but I not have a strong union who fights for us. I have NEVER been able to select a shift that I wanted to work, this is not how the Catering department conducts its scheduling. Although the other union departments can select the events and shifts, the ~~productive~~ Catering department cannot. Since the company states that we can choose our shifts but not area to work in and I have never been allowed to do so, I feel the EEOC should look into this matter as well. I was not always put on shifts that would make the most gratuity being the second in seniority. To the contrary of the company's request to dismiss my charges without further inquiry would not only be unfair to me as I have proof and witnesses to back up my claims it would embolden the company to continue with to discriminate against employees.

I was taken off VIP parties, new white employees serviced the Ilitch's and Steve Yzerman. I was taken off Boardrooms with the Detroit Red Wings. The new assistant manager Kobby made sure I did not get a certain number of shifts so I would only make a certain amount of money. I had spoken to Mark Helmstead about this and he stated to me that he had spoken to Kobby about the scheduling but it continued.

Richard was terminated as I kept notes and asked for a meeting in late July to discuss and present my findings with witnesses and the company was aware I had a charge with the EEOC. Since late April I did not have any concerns that I shared with management as this always got me into trouble. I started taking notes of everything happening. I asked for a meeting in late July to discuss just a few of the things I had been subjected too with witnesses. I followed up with minutes from the email which was sent to the Manager, Assistant Manager and Human Resources which nothing I stated was disputed. Things the department knew but giving the company the benefit of the doubt maybe Human Resources was not aware of how the catering department had and has been operating. As, a result of my meeting Richard was again suspended and relieved from the company. I also shed light on the assistant manager and manager to HR and they were present at the meeting and could not dispute. I have endured great pain with this company especially the Catering Department.

I am an African American, black female over the age of 40 years old with a diagnosed breathing condition. My job performance met the employer's legitimate expectations as I have never been disciplined in my 5 years of service with the company I just verified this with Human Resources. I had been taken off VIP parties which do tip, The Red Wings boardroom. I have not been allowed to service green rooms but new employees did. They utilized people under me to serve as bartenders and people below me got more hours than I. I was asked to work club for $14 her hour for the Pistons, I declined and was retaliated against for that. Employer sent of separate schedules to hide shifts. I was looked over and denied double shifts. I have never been allowed to work a talent room since I started with the company my male coworker which I am higher in seniority was given the opportunity to train and has now mastered the talent rooms along with other new and transferred coworkers as well as collages from different departments. I've asked to worked these events I asked about training several times and was never granted the opportunity to work while white male, new white employees all under me in seniority as well as employees from other areas worked the rooms and backstage leaving me out and belittling me.

As I stated white workers, especially younger new white hires were and are treated differently that I from October1, 2021 to present. These new hires top service the Ilitch Family on several occasions, talent rooms for concerts and red wings and green rooms and popular concerts and back stage events. It is so blatant as I was the only female black server for some time on the schedule. This behavior is a happening now. My claims do not fail. The company continues to say that I can choose my shift but not location is untrue for me. I have never missed a day of Family Lounge until I had Covid which I was exposed by manager Kobby . As I stated before we did not have the Family Lounge this season at all because of Covid. The family was not allowed to even enter the Lounge per the NBA for protocol reasons. We were in a small entry way. There were employees who knew how to work the lounge(alternates) but instead the so-called training came after my complaint with less than 2 months left in the season and they decided to train newly hired employees which at the time servicing the room was by seniority. The goal was to push me out. Our tips are pooled for the day. So, if I am scheduled for an event that pays lower gratuity I get the rate of the day not the week. The tips are pooled on a daily basis. pay. When I returned to work I was placed on a shift with Richard before any investigation took place on February 9 which paid me lower gratuity for the week than new white employees.   If we are all working on a day and share the tips I am working longer and harder than others. I am doing the grunt work because of my seniority knowing where things are I am tasked to running around while new employees huddle and talk. On rare occasion if I were working behind the line and chatting with someone black I was told to do something else if it was down time.

THE COMPNAY IS TRYING TO PIVOT FROM MY CLAIM! THE FAMILY LOUNG WAS NOT MY ONLY COMPLAINT ALTHOUGH THEY TRIED TO FORECE ME OUT. I DID THE MAJORITY OF THE SHIFTS. HOWEVER, I AM STATING THAT I WAS NOT ALLOWEED TO WORK IN OTHER PREIUM AREAS AND OR SOME WERE TAKEN AWAY FROM ME ESPECIALLY AFTER MY COMPLAINT AND REPORTING OF THE THEFT TAKEN PLACE. THIS is more BLANANT and apparent this season.

* The company paid some workers regular granuty to work the Club but offered me $14 an hour,

it is significate that Mark Hjestead and I worked for 5 years together and there has always been an ongoing battle with us in regards to discrimination. Mark Hjemstead always allowed me to *Be* harassed by a white employee from the beginning of the arena we have had several conversations sometimes with Human Resources involved and I was told I had to find a way to get along. This employees' behaviors towards me and other coworkers was disruptive and demeaning it called for a hostile environment. It wasn't until it was reported by other employees she was going to wait outside the arena and hurt my son who was also employed in the department at the time, that an investigation was conducted and she was fired my son was never given any information for his safety. Mark Hjemlsted and I have never had a good relationship I have always told him when he was being dishonest, unfair, discriminating against me and the harassment I endured from management and staff. I agree to disagree with Mark but it never affected my job performance as this was a job I wanted before the building was completed. Mark does not like dealing with the hard things instead he turns his head, acts as if he doesn't know what is going on and let situations fester until they become volatile, There were other employees in the department who knew how to work the family lounge instead of training new hires. This as the company has stated was a premium lounge and only a few people were allowed to work it and certainly it was unfair to skip over seniority employees and drop down the list to train friends of management. Reminding you that there was no family lounge this season we only had grab and go items this new training only occurred after my complaint to management. It is quite telling that management wanted to train other white employees for the family lounge, management wanted and did train other employees in the backstage talent rooms I have never been allowed to train and work them. The company has discriminated against me by not letting me work in areas that white employees work and new white employees are trained to work the areas leaving me out. Just recently, Mary J Blige had a wine tasting back stage and white female hired about 3 months ago worked the event. Lizzo event I was not allowed to work; Post Malone I was not allowed to work just to name a few. New white employees served the Illitches I have not. I have been degraded by all of these claims I have become paranoid as I know people are always watching me and huddled up talking about me and ridiculing. I have suffered medical symptoms because of this treatment. Richard Shanks has been terminated from the company after an investigation in early August. I had stop complaining about Richard and the daily harassment he does and just started taking notes and called for a meeting to share some of my encounters. What I found was no Surprise as the company knew how Richard behaved and did nothing about it. It wasn't until I brought HR into again that Richard was removed.

I am now #1 in seniority and it is despised by all, management, staff. they honestly can't believe a black woman is top server deserving of first and most shifts. However, the company is now showing seniority means nothing as I am #1. They put who they want on the shifts that they want which has made me a laughing stock. The department hired 8 new servers all white and 6 of which are women. The reason I am disliked my management is because I don't allow how they treat me go unchecked. They may not do anything about it and treat me worse but I still let it be known about the unfair treatment towards me.

This company rewards bad behavior. For instance, the manager stole merchandise, she became embolden and I became the victim. I asked for an investigation it did not happen instead I

became the bad guy. I asked management to have security to run camera and speak with security present and witness but that did not happen.

Another coworker I told that he was discussing his sex life with employees and management well he has been promoted to a supervisor in another department. This is just a few examples. An employee had an inappropriate call off as I did nothing happened to her. Employees are consistently late and call off nothing happens. It's like a cult there or hard Right-Wing values. I had been consistently subjected to conspiracy theories which was witnessed by management. This was also racist talk.

This is a seasonal position the goal is to make and work as much as possible during the season, Swearing by management, by degrading comments coworkers stealing of food, Other's open carry food out which is a fireable offense.

I have been discriminated against because of my race, color, sex, disability, The Supervisor said it was my fault the reason Richard talks to me like he does because I allow it. No, the company had and has allowed it.

The department keeps doing things too try and push me out the union is no help at all please help!

A. I have been being discriminated against based on my race, color, age, sex, disability and national origin. I have been subject to rude, obscene, profane, offensive embarrassing and abusive language from managers and coworkers also in the presence of guests. The company states this behavior is a conduct violation. I have been retaliated against for reporting and complaining to management. I made my complaints known to Manager, Human Resources, Corporate Human Resources and the General Manager.

The Corrective Counseling sets forth guidelines for an Associates discipline utilizing a progressive approach to discipline. I had never had a disciplinary action in the 5 years working for the company. After my complaint I was called into the office for an attendance violation that was invalid. I followed protocol with the information I was given. The dates were inaccurate citing a day I worked but the manager said I didn't which I have proof. The Manager said I was out of excused and unexcused absences I was never notified of my status. Three of the days were taken together for bereavement which he counted against me and other days were illness due to Covid which I contracted at work from the assistant manager. I filed a grievance against the dates and waiting for a meeting to this date.

B. I was hired with the company in July 2017 as a Catering Server at Little Cesar's Arena. I earn wages and tips in my role tips are supposed to be equally split for everyone working that day. To the contrary it does matter what shifts you work as not all shifts max out in gratuity. Management knows which shifts will max out before they schedule and they schedule who they would like to receive the max instead of scheduling by seniority. My position is a union position. The company alleges that employees do not have a right to choose the particular area they want to work but may bid on the shift the want to work. I do not believe this is valid as all other union departments get to choose events they want to work by seniority. Even if the company is correct in saying we can choose our shifts I have never once

been allowed to choose shift to work which I would like the commission to also look in this matter. I have worked the Family Lounge for the last 3.5 years along with another coworker James Collins. We never rotated this room it was always the two of us and was told by the Manager it was our room. This along with the locker room kept the same people so players, and families as well as Pistons staff were familiar with each other. Due to Covid 19 I had to change partners James took the locker room and Richard came to the lounge. Richard did work with James and I a half season prior serving the dessert cart. The new assistant manager was a bartender in this lounge and was envious even though she moved up to assistant manager missed the room and did not want me in there. She wanted to place her friends in the Lounge I also told Management, HR General Manager and a Pistons staff member that she had stolen merchandise for the fans in fear they would assume I had taken it and was advised to do so by my union. The assistant manager trying to get me out of the Lounge. I was called into the office one day by Kobby on a conference call with Mark stating we were having so problems in the Lounge. I spoke with the Pistons staff and the issue was with Richard not myself but they continued to schedule Richard in the lounge. It was witnessed that Richard was a slacker and I did 85 % of the work and directed him every day. The first day I was off for Covid Ricard was lost and did not know how to set up the room or do much of anything. I had never missed a day for Family Lounge since working there until Covid of this year. Richard and I were paired together because of seniority we were never close friends we were coworkers. All of the catering department parked at the park or the side street so we all would walk in the same direction because we all were parked on the same street Richard was not walking me to my car for safety. Richard would light a cigarette as soon as we walked out the building and the smoke would bother me so most times I walked ahead. After my complaint to management, I walked to work most of the time. Richard, being number 1 senior, never had a choice in what shifts he worked and myself, being number 2, never had a choice in what shifts I wanted to work. This is blatantly untrue.

C. January 29, 2022 Richard Shanks grabbed my hand in the office I yanked it back. Assistant Manager states, wow Ms. Mona is feisty today. I was exposed to Covid 19, Assistant manager had Covid 19 I was direct contact with her. Manager witness the incident as well. Later on, in the Shift Richard made an obscene gesture to me in the Gondola. A coworker and supervisor were present. Coworker advised Richard he needed to find somewhere else to keep his keys. The supervisor did not say one word which is a friend and former colleague to the manager. I also reminded Richard that I had advised him previously about this same gesture that there would be consequences if he did it again. The next day January 30,2022 In the Family Lounge Richard placed his hand on top of my hand 3 times I walked away and was blocked by Richard's body from entering the room which I had to walk around to the other side. Richard made inappropriate comments the rest of the shift. January 31 Richard and I were scheduled to work together. Richard stated the night prior we were going
To hold hands and sit next
To each other, I called off sick as I was feeling worse since Saturday, I had covid but did not know at the time. I called off the next day as well I gave Mark a full verbal account of what happened during the past weekend but I am sure he already knew most of it. Mark asked me

to put into writing what we had discussed at first, I agreed but after reflection decided not to. I asked for a zoom or conference call instead. On February 3 I reported to work which was the Family Lounge but was sent home because I looked ill to the supervisor and she told me I needed to get a Covid test because Kobby had Covid. Later, that evening I noticed I was not working the lounge all shifts for the next week and reached out to Mark and supervisor why this was. Mark never explaining anything about staffing needs in the family lounge. We have people who knew how to work the Family Lounge before the people they put and wanted to place in there. Mark has been the manager since the family lounge and never rotated or trained other people for the job. We already had alternates to work in case one of us were off who knew how to work the room. This rotating was a way to get new hires all which had been hired this season to work the area. It seems very odd that they would consider training with just 2 months to go in the season especially since we did not have a family lounge this season due to Covid we only had an entryway with grab and go snacks. I returned to work the Family Lounge and when I started setting up, I discovered all my products were expired, all my bagged snacks I was livid. I went to the general manager and told him as I wanted him to see for himself that I had boxes of expired food I felt I was being set up. Mark and Kobby come in upset because their boss told them to move the product cornered me up in the lounge and was talking aggressive and abusive to me asked why did I call Tim, I told them because he needed to see with his own eyes some of the scenario's I face. Mark told me I seemed agitated. Mark claims he was upset at the fact I would think they would purposely put expired product on my shift. I told Mark he seems agitated he then yelled at me and told me to see Asia. I went to Asia and sat in her office she asked why was I there and I stated I don't know Mark told me to come. So, Asia, Tim and I had a meeting a decided I could take a two-week unpaid leave until baseball started at Comerica Park I agreed.

D. I did frequently work the family lounge this season, however of the last 3.5 years I worked it every game not missing one day. The company states the CBA does not provide for servers to pick area to work but are allowed to pick shifts and bid on this was never the case for me. The week of February 10-17 I was not scheduled to work every day as we do not work every day only Piston Games, Red Wing games, Concerts and private events when scheduled. I did call off 2-3 days during that week as I was still recovering from Covid and my tooth had become inflamed with the infection. I sent a picture of my face as well as presented a copy of dentist note and copy of positive Covid test.

It is quite telling that the company wanted to train new employees to work the family lounge when they would skip over others who had begun from the beginning. It is also telling because the family wasn't allowed in the Family Lounge because of the Covid protocols we only had like an entryway to work in. I question wanting to train other to work the lounge when they had new hires for the season working premium areas I never had the chance to work and I was pulled from the areas I did service and replaced with white employees.

I was told by my Union Rep that I would not be working with Richard but she was wrong and I was told I would miss shifts If I did not I decided to work with Richard because I did not want to lose out on my limited shifts.

I did work the Dua Lipa concert clearing plates and going back and forth to the dish room while new hires were working the back stage setting up green rooms and being training and I asked about work these several times but never allowed. Other new employees just stood behind the

serving line wanting to serve who ever came in. I was harassed on this shift by my management and coworkers.

I have been discriminated against by this company and it continues to this day.

We have multiple employees who both work Little Caesars Arena and Comerica Park. I misunderstood what the two-week leave meant. I was under the impression that I would be off for two weeks until baseball started and I would work at both locations as the other employees do. When I read the email sent by Asia it sounded as If I would not return to LCA until the fall That was not I what I took from the conversation we had, the catering department also took my name off the schedule as if I wasn't employed there anymore. So, I called and asked to return and work both locations because I don't trust the company.

The 2 call off dates for late April are in question as they are not listed on the dates provided by Mark in May for my call ins for the season.

This mishandling of the investigation and letting inappropriate behavior stand caused and is causing a hostile environment.

Please further my claims with Delaware North and continue with an investigation surely being sexually harassed for 5 years by a worker and enduring all I have with discrimination and racism I have as well as a union with failing membership seem to be conspiring with the company. There have been many employees who have left the arena by termination or on there on will I find any reasonable person would not work under the conditions I have. To dismiss any of my claims would be detrimental to myself and the community that servers it.

Thank for you time

Ms. Wooten to allow me to share what is happening with me at this company.

Mona Matthews
313-265-5156

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Mona Matthews

**DEFENDANTS**

Detroit District SportsService, Inc

**(b)** County of Residence of First Listed Plaintiff   Wayne
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Wayne
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

■ 1  U.S. Government Plaintiff

☐ 2  U.S. Government Defendant

☐ 3  Federal Question
*(U.S. Government Not a Party)*

☐ 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ■ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | ☐ 370 Other Fraud | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| | | | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ■ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

■ 1  Original Proceeding

☐ 2  Removed from State Court

☐ 3  Remanded from Appellate Court

☐ 4  Reinstated or Reopened

☐ 5  Transferred from Another District *(specify)*

☐ 6  Multidistrict Litigation - Transfer

☐ 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

Brief description of cause:
DISCRIMINATION DUE TO RACE, SEX AND AGE DISCRIMINATION ACT 1967

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE

DOCKET NUMBER

DATE

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #     AMOUNT     APPLYING IFP     JUDGE     MAG. JUDGE

PURSUANT TO LOCAL RULE 83.11

1.        Is this a case that has been previously dismissed?        ☐ Yes

          If yes, give the following information:                   ☒ No

Court: _____

Case No.: _____

Judge: _____


2.        Other than stated above, are there any pending or previously
          discontinued or dismissed companion cases in this or any other        ☐ Yes
          court, including state court? (Companion cases are matters in which    ☒ No
          it appears substantially similar evidence will be offered or the same
          or related parties are present and the cases arise out of the same
          transaction or occurrence.)

          If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____


Notes :